**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

OC VENTURES AND YANGLONG SONG

              Plaintiffs

       -against-

IVY FUND MANAGER LLC AND
SHANGXUAN TAN

           Defendants

-------------------------------------------------------------x

Civil Action No. _____

**VERIFIED COMPLAINT**

**DEMAND FOR JURY TRIAL**

**VERIFIED COMPLAINT**

Plaintiffs OC Ventures ("**OC Ventures**") and Yanglong Song ("**Song**" and each of Song and OC Ventures a "**Plaintiff**" and, collectively, the "**Plaintiffs**"), by their attorneys, bring this action against defendants Ivy Fund Manager LLC ("**Ivy Fund**") and Shangxuan Tan ("**Tan**" and each of Tan and Ivy Fund a "**Defendant**" and, collectively, the "**Defendants**") and, in support thereof, respectfully allege as follows:

**NATURE OF THE DISPUTE**

1.    This is an action for breach of implied contract and quantum meruit/unjust enrichment. This action arises as a result of Defendants' failure to repay in excess of $34 million owed to Plaintiffs.

2.    Defendant Ivy Fund is a real estate private equity company that specializes in the acquisition and management of off-campus student housing properties throughout the United States. Defendant Tan is the founder and principal of Ivy Fund.

3.    Ivy Fund is in severe financial distress. Compounding the precariousness of the situation, Tan, who exercises exclusive control over Ivy Fund, admitted to shifting monies between accounts held by Ivy Fund or Ivy Fund subsidiaries to cover expenses of various properties in Ivy

1

Fund's portfolio, effectively operating a Ponzi-like scheme to potentially enrich himself, hide assets from, or make it nearly impossible to obtain repayment by creditors like Plaintiffs. For this and reasons further alleged below, Plaintiffs seek the appointment of a receiver on an expedited basis.

4.    From 2017 through 2022, Plaintiffs lent money to Ivy Fund and its various subsidiaries in an amount totaling over $35 million, of which over $34 million is still outstanding.

5.    Plaintiffs lent money and provided financing to Ivy Fund and its various subsidiaries in three ways. First, Plaintiffs provided financing to Defendants via secured notes governed by a series of related template agreements (the "Note Agreements"). An example of the template "Senior Secured Note Agreement" is attached as Exhibit A. Second, Plaintiffs provided direct financing to Ivy Fund to fund Ivy Fund's purchase of certain real estate properties for its portfolio. Third, Plaintiffs lent additional money to Defendants.

6.    As security for the repayment of amounts loaned under the Note Agreements, Ivy Fund pledged (and Tan promised to pledge) to Plaintiffs the membership interests in Ivy Fund and various wholly owned subsidiaries of Ivy Fund that managed or ultimately hold title to the properties within Ivy Fund's portfolio (collectively, the "Ivy Fund Collateral") pursuant to the terms of a written Membership Interest Pledge and Security Agreement. An example of the template "Membership Interest Pledge and Security Agreement" is attached as Exhibit B.

7.    Ivy Fund has failed to pay in excess of $34 million due to Plaintiffs.

8.    Multiple other lenders have obtained confession of judgments and/or court-ordered judgments against Ivy Fund and Tan and are actively collecting on those judgments.

9.    It is clear that Ivy Fund is unable to pay its debts. Indeed, counsel for Defendants in another legal action initiated by US Investment Properties, LLC ("USIP"), described further

below, admitted that the initiation of that action—which has now resulted in a stipulated turnover order—would cause a bankruptcy event for Defendants. *See* Exhibit C at 7.

10. As described in more details in Paragraph 65 below, the USIP action further reveals that Tan has, nonetheless, retained revenue generated at properties in Ivy Fund's portfolio, such as rent payment and management fees, for his own benefit.

11. In fact, active litigation against Defendants already includes allegations of fraud, misrepresentation, conversion, criminal theft, and falsification of bank documents against Ivy Fund and Tan.

12. To stop this fraud and mismanagement, and ensure assets are preserved for the benefit of all parties with interests in the Ivy Fund Collateral, and in claims and/or potential claims against Ivy Fund and Tan, the best path forward is the appointment of a federal equity receiver. That receiver, with the full power and authority that may be granted to it by this Court, will be able to capably manage Ivy Fund's properties and ancillary businesses across states, and thereby maintain and preserve the value of the Ivy Fund Collateral for the benefit of Plaintiffs and all other creditors and judgment holders.

13. Time is of the essence with respect to the appointment of a receiver.  A receiver needs to be immediately appointed in order to install capable management of Ivy Fund's business, provide clarity to, and obtain the cooperation of, business partners and investors, provide relief with respect to other creditors and third parties, stabilize the operations of Ivy Fund, and prevent further dissipation of assets and waste to the company.

14. Plaintiffs therefore seek the appointment of Steven Edelson, Chairman of The Mercantile Companies, as receiver over Ivy Fund.

## PARTIES

15.    Plaintiff OC Ventures was a Cayman Islands exempted company with a registered office in the Cayman Islands.  OC Ventures is no longer registered as a Cayman Islands entity.

16.    Plaintiff Song is a director and the sole shareholder of OC Ventures.  Song is a Chinese citizen with an address in Chengdu, China.

17.    Defendant Ivy Fund is a Delaware limited liability company with its principal place of business located in Charlotte, North Carolina.  Ivy Fund is a real estate investment and holding company which, through its various subsidiaries, indirectly owns and manages certain student housing properties located throughout the United States.

18.    Defendant Tan is a founder and member of Ivy Fund.  Defendant Tan has an address in the State of Massachusetts.  Upon information and belief, Tan has relocated to Singapore.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

20.    This Court has personal jurisdiction over Defendants because each Defendant has made and established contacts within the State of New York sufficient to permit the Court's exercise of personal jurisdiction, including the purchase and management of at least four commercial real estate properties in New York.

21.    Venue is proper pursuant to 28 U.S.C § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Further, pursuant to the terms of the Note Agreements, parties consented and agreed to the exclusive jurisdiction of "courts located in New York County, City of New York, New York".  *See* Ex. A, § 11.9.

4

## FACTUAL BACKGROUND

**A. Ivy Fund's Business**

22.     Ivy Fund is a Delaware limited liability company registered in 2016. At the time of registration, Tan was the sole member of Ivy Fund.

23.     Tan exercises exclusive control of Ivy Fund and manages the affairs of Ivy Fund.

24.     Ivy Fund is a real estate investment and holding company, whose portfolio is comprised of student housing properties in the United States, including properties in Illinois, New York, North Carolina, and Alabama.

25.     Through its various direct and indirect subsidiaries, Ivy Fund owns or manages certain real estate properties including the following:

- Block20, an apartment complex near the University of Buffalo campus, located at 100 Herron Dr, Amherst, NY 1422

- Block75, an apartment complex near the University at Albany campus, located at 1475 Washington Ave, Albany, NY 12206

- Lofts at Gold Street, an apartment complex near the University of Rochester campus, located at 1188 Mt Hope Ave, Rochester, NY 14620

- The Hill at Rochester, an apartment complex near the University of Rochester campus, located at 20 Fairwood Dr, Rochester, NY 14623

- Block 43 Courtyard, an apartment complex near the University of North Carolina Greensboro campus, located at 3643 Clifton Rd, Greensboro, NC 27407

- Lighthouse Wilmington, an apartment complex near the University of North Carolina Wilmington campus, located at 4955 Pepys Ln, Wilmington, NC 28403

- The Automatic Lofts, an apartment complex near the University of Illinois Chicago campus, located at 410 S Morgan St, Chicago, IL 60607

- Auburn Midtown, an apartment complex near the Auburn University campus, located at 1188 Opelika Rd, Auburn, AL 36830

- The Balcony Auburn, an apartment complex near the Auburn University campus, located at 137 E Glenn Ave, Auburn, AL 36830

26.     Ivy Fund's interests in these properties all constitute Ivy Fund Collateral and all are, or have been, subject to lawsuits by Ivy Fund's lenders seeking payment based on Ivy Fund's defaults on its debt obligations.

27.     As further described below, one of the properties in Ivy Fund's portfolio, Block 43 Courtyard in Greensboro, North Carolina, has already been placed into receivership due to Tan's gross mismanagement of Ivy Fund, which caused Ivy Fund to be in blatant contempt of a court order.

**B.  Ivy Fund's Obligations to Plaintiffs**

28.     Beginning no later than July 2017 and through at least April 2022, Plaintiffs loaned the Defendants more than $35 million for the benefit of Tan, Ivy Fund, and/or its various direct and indirect subsidiaries.  *See* Ex. D (collection of excerpts of relevant bank statements).

**i.  Plaintiffs Provided Debt Financing to Defendants Pursuant to the Terms of Note Agreements**

29.     First, Plaintiffs provided secured financing to Ivy Fund pursuant to the terms contained in the template Note Agreements included herein as Exhibit A and Exhibit B.  The terms of these Note Agreements were negotiated between Plaintiffs, Ivy Fund, and Tan though the exact forms were not executed with respect to each individual financing.  Instead, the parties agreed that,

even without signed agreements, the terms of the template Note Agreements would govern the terms of Plaintiffs' various investments.

30.     More specifically, prior to acquiring any specific real estate property for Ivy Fund's portfolio, Defendants engaged in various fundraising activities including approaching Plaintiff Song and other individuals located in China.  Plaintiff Song and other individuals located in China would consider the particular property at issue and then, if they wanted to participate in Ivy Fund's acquisition of that property, provide funding to Ivy Fund through OC Ventures with the understanding that such funding was to be governed by terms contained in the Note Agreements set forth in Exhibit A and Exhibit B.  In accordance with those terms, Ivy Fund agreed to repay the principal amount loaned to it by OC Ventures, *see* Note Agreement § 2.1(a), and would agree to pay interest at an agreed-upon, market rate, *see* Note Agreement § 2.1(b).  The parties would also agree on a series of "Events of Default" the occurrence of which would permit OC Ventures to exercise remedies.  *See* Note Agreement § 9.1.  Such remedies included, *inter alia*, OC Ventures' right to exercise "all of the rights and remedies of a secured party on default under the Uniform Commercial Code" with respect to the pledged Ivy Fund Collateral, *see* Pledge Agreement § 11(a), and OC Ventures' right to act as Pledgor's "attorney-in-fact" with respect to the pledged Ivy Fund Collateral "with full authority in the place and stead of Pledgor" to "take any action and to execute any instrument which" OC Ventures may deem necessary to accomplish the purpose of the Note Agreements, *see* Pledge Agreement § 7.

31.     Pursuant to the terms of these Note Agreements, OC Ventures lent Defendants no less than $18 million.

32.      Several Events of Default have now occurred including (a) Ivy Fund's failure to pay principal when due, *see* Note Agreement § 9.1(a)(i); (b) Ivy Fund's failure to pay interest when

due, *see* Note Agreement § 9.1(a)(i); and (c) the entry multiple, final judgment against Ivy Fund (as described further herein) "for the payment of money in excess of $1,000,000 in the aggregate at any time," *see* Note Agreement § 9.1(f).

33.    In addition, because Plaintiffs have been forced to file this action against Ivy Fund to address these Events of Default, Ivy Fund is obligated to pay OC Ventures any professional fees and expenses, as well.  Specifically, Section 11.3(c) of the Note Agreements requires Ivy Fund to pay OC Ventures "all reasonable and documented out-of-pocket fees, costs and expenses" incurred in connection with "any attempt to enforce any remedies of" OC Ventures against Ivy Fund "or any other Person that may be obligated to" OC Ventures "by virtue of any of the" Note Agreement, and certain related documents, "including any such attempt to enforce any such remedies in the course of any work-out or restructuring" during the "pendency of one or more Events of Default." *See* Ex. A § 11.3(c).

### ii.    Plaintiffs Provided Direct Financing to Defendants' Acquisition of Real Estate Properties in Ivy Fund's Portfolio

34.    In addition to loans made pursuant to the Note Agreements, Plaintiffs provided direct financing to fund Ivy Fund's acquisition of real estate properties by wiring funds directly to title companies on Ivy Fund's behalf.

35.    Prior to acquiring any specific real estate property for Ivy Fund's portfolio, Defendants engaged in various fundraising activities including approaching Plaintiff Song and other individuals located in China.

36.    Plaintiff Song and other individuals located in China would consider the particular property at issue and then, if they wanted to participate in Ivy Fund's acquisition of that property, loan funds to Ivy Fund through OC Ventures with the understanding that Defendants would inform Plaintiffs of the status of that property and repay funds loaned for the acquisition of that property.

37.    Beginning at least 2018 through 2021, Plaintiffs financed Ivy Fund's acquisition of real estate properties on multiple occasions through a series of loans.  For example, Plaintiffs provided financing to fund Ivy Fund's acquisition of real estate properties on April 4, 2019 by wiring $2,400,000 to Landstar Title Agency, Inc.  On August 21, 2019, OC Ventures transferred $714,000 directly to Greystone Servicing Corporation.  On November 12, 2019, OC Ventures, again, wired $4,400,000 to Landstar Title Agency, Inc.  On January 14, 2020, OC Ventures again transferred $501,600 directly to Greystone Servicing Corporation.  Plaintiffs provided direct financing, on Defendants' behalf, to fund Ivy Fund's acquisition of real estate properties in a total amount of no less than $11 million.

38.    Initially, Defendants were able to make certain repayments to OC Ventures. However, since early 2022, Defendants have failed to repay any remaining amounts owed to Plaintiffs.

39.    Plaintiffs provided direct financing, on Defendants' behalf, to fund Ivy Fund's acquisition of real estate properties based on the understanding and expectation that Defendants would repay Plaintiffs these loaned amounts.  Defendants' conduct, by repaying a portion of these loans, clearly indicates that Defendants understood these financings were loans and that they intended to repay Plaintiffs the full amount loaned.

### iii.    Plaintiffs Lent Additional Funds to Defendants

40.    Next, Plaintiffs also lent funds to Defendants directly for Tan's personal benefit.

41.    For example, on June 25, 2018, OC Ventures lent Tan $400,000 directly to his personal account.  On March 11, 2020, OC Ventures lent Defendants $500,000 by wiring the funds to BigOne Lab Technologies on behalf of Tan.

42.     In addition, Plaintiffs lent funds to Defendants to cover operational and business expenses of Ivy Fund by wiring funds directly to various individuals and entities on Defendants' behalf.

43.     Plaintiffs lent Defendants these funds, totaling at least $6 million, with the understanding and expectation that Defendants would repay Plaintiffs the loaned amount of funds.

44.     While in the beginning, Defendants were able to repay certain amounts to OC Ventures, since early 2022, Defendants have failed to make any repayments.  Defendants' conduct indicates that they understood these were loans that needed to be repaid and that they intended to repay Plaintiffs for the full amount.

**C.    Ivy Fund's Egregious Mismanagement**

45.     In addition to Ivy Fund failing to honor its obligations to Plaintiffs, Defendants have defaulted on multiple other debt obligations and personal guaranties, resulting in multiple collection actions being instituted against both Ivy Fund and Tan.

46.     Further, active litigation against Defendants call into question the legitimacy of Ivy Fund's structure and its multiple shell entities that are subject to Tan's exclusive control and domination, a structure susceptible to financial crimes such as fraud, embezzlement, and money laundering schemes.  In fact, Tan allegedly has admitted that he "shift[ed] monies between accounts to cover expenses of various properties within [the Ivy Fund's] portfolio," including by using "funds … to repair damage at a separate [Ivy Fund] property" than the one to which the funds were loaned, even though those funds were loaned to and secured by specific properties. *See* Ex. E ("CDH Complaint") at ¶ 35.

47.    Underscoring the fact that Tan realized he was operating a Ponzi-like scheme—robbing one set of investors for the benefit of another set as he moved funds willy-nilly throughout his byzantine corporate empire—Tan further admitted the transfers "were wrongful." *Id*.

48.    Indeed, as described further below, more than one party has alleged fraud and misrepresentation against Tan and Ivy Fund.  Conveniently, Tan has relocated to Singapore, making collection efforts even more difficult and expensive.

49.    It is apparent that the current catastrophic mismanagement of Ivy Fund has caused the business to crumble and Ivy Fund Collateral to dissipate.  Without immediate legal intervention, Plaintiffs and other creditors and stakeholders will be left with no recourse.

**I.    Allegations of Fraud, Misrepresentation, and Deceit**

*i.    The CDH Action*

50.    On November 22, 2023, CDH Real Estate Investment Management Company Limited, Cook Summit Holding, LLC and Cook Summit Investor, LLC (collectively, "CDH") filed a complaint against Ivy Fund, Ivy Fund principals, and certain Ivy Fund subsidiaries in Alabama State Court, Lee County (43-CV-2023-900453).  Specifically, CDH sought to hold Ivy Fund and other defendants "responsible for their **widespread, longstanding scheme to defraud** Plaintiffs of millions of dollars . . . by **misrepresenting more than $1 million in stolen funds** as 'loans' on financial statements, and **falsifying bank records to hide more than $1 million** in unauthorized withdrawals." Ex. E at ¶ 1 (emphasis added).[1]

51.    CDH claims that Ivy Fund ran a "**fraudulent enterprise**" and orchestrated a conspiracy to carry out an "**ongoing, large-scale theft.**"  *Id*. at ¶ 5 (emphasis added).  Specifically,

---

[1] While the CDH Complaint names Ivy Fund and its subsidiaries collectively as "OC Ventures", it is not referring to Plaintiff OC Ventures.  "OC Ventures" as used in the CDH Complaint refers to Ivy Fund and its subsidiaries. Plaintiffs are not parties to the CDH Action.

Ivy Fund and its subsidiaries "**submitted fraudulent financial ledgers** to CDH that falsely identified more than $1 million in unauthorized transactions as 'shareholder loans,' . . . [and] **engaged in a scheme where they unlawfully withdrew $1 million** from [the bank accounts owned jointly with CDH], then **concealed those transfers from CDH by doctoring account statements to either erase evidence of the transactions entirely, or alter the transaction amounts**." *Id*. at ¶ 6 (emphasis added).

52.    Indeed, as described above in paragraphs 46-47, Tan allegedly admitted that he has operated the Ivy Fund entities in furtherance of a Ponzi-like scheme by "shift[ing] monies between accounts to cover expenses of various properties within [Ivy Fund's] portfolio," which "were wrongful." *Id*. at ¶ 35.

53.    As evidence of the egregious mismanagement of Ivy Fund and apparent pattern of fraudulent conduct under Tan's control, the CDH Complaint details how Ivy Fund intentionally altered account statements and falsified bank records to hide its unlawful activities.  *Id*. at ¶ ¶ 44-62.

54.    Further, Defendants allegedly attempted to escape their debt and legal obligations via an attempt to sell properties—the only underlying asset— "in secret" and without authority, Defendants attempted to sell the Alabama property at Auburn University Midtown "so that it can keep its share of the proceeds from the sale, and, through a private wind-down . . . **sweep its illegal conduct and malfeasance under the rug**." *Id*. at ¶¶ 10, 72 (emphasis added); *see also id*. at ¶¶ 9-12; 63-72.

55.    Sharing the concern of Plaintiffs and other Ivy Fund creditors, "CDH [also] does not believe that [Ivy Fund] currently has the money to repay the stolen funds" based on

Defendants' "duplicitous conduct, empty promises, and representations concerning its financial condition." *Id.* at ¶ 8.

56.     Ivy Fund did not appear in the CDH lawsuit until CDH filed a *Motion for Default Judgment*. Because of Ivy Fund's belated action, the court denied CDH's Motion for Default Judgment, and the lawsuit alleging fraud and conversion is proceeding. Further, on October 21, 2024, counsel in the CDH action informed the court "of complications beyond the control of the attorneys", which raises additional concern as to the legitimacy of Ivy Fund's operations. *See* Ex. R.

### ii.    *The Xiao Action*

57.     CDH is not alone in alleging fraud against Defendants. Another creditor, Daili Xiao, filed a *Motion for Summary Judgment in Lieu of Complaint* against Ivy Fund in New York State, New York County (Index No. 653714/2022) on October 7, 2022, based on Ivy Fund's default pursuant to a promissory note in the amount of $2 million. In an affidavit filed in that case, Mr. Xiao states that "in the over seventeen months since April 9, 2021, Mr. Tan, on behalf of Ivy Fund, has repeatedly promised to **make payments to me**, communicating that Ivy Fund might sell assets, **bring in new investors, or secure money from China, to do so**", Xiao Aff., Ex. F at ¶ 15 (emphasis added).

58.     Tan's promise to Xiao——in addition to Tan's admission that he "shift[ed] monies between accounts to cover expenses of various properties . . . ."——further confirms that Tan is operating a Ponzi-like scheme that has included misappropriating funds received from Plaintiffs either for his own financial benefit or to pay other Ivy Fund debt.

59.     The court granted Xiao's motion and awarded judgment against Ivy Fund in the amount of **$2,490,972.18**.[2]  Ex. G.  Two years later, Xiao is still pursing collection efforts and has alleged "various **deceits, fraud and misrepresentation**", specifically noting that "**the Tan Defendants cannot be trusted** . . . [and] have set up a confusing, multi-layered vertical ownership structure to hide the true ownership of various assets and have outright **lied about the identity of the owners of membership interest in various title holding entities, purporting to pledge the same asset to [more than one party].**"  See *Complaint for Declaratory Judgment to Escrow Funds, Enjoin Distribution of Sale Proceeds to Related Entities and Turn Over Next Sale Proceeds,* 2024CH03353 (Cook County Chancery Division, April 17, 2024), Ex. H at ¶ 4.

60.     Xiao's action further exposes that operations at Ivy Fund are being run as a scheme to effectively defraud creditors and casts serious doubt to the possibility to recover any debt under Tan's management.   Specifically, Xiao alleges that Ivy Fund operates "**a myriad of sham organizations that proliferate the Tan empire**, established for no other reason than to hide true ownership and confuse creditors".  *Id*. at ¶ 25.  Further, "Tan, who sits atop this empire, while claiming to have a Boston address, has moved to Singapore, far beyond the reach of any United States court." *Id*. at ¶ 5.

61.     Despite obtaining charging orders from the Delaware Chancery Court "compelling Ivy Fund Manager LLC to turn over any funds it receives for the benefit of Mr. Tan", *id*. at ¶ 6, Xiao claims "absolutely **no chance** that, acting on behalf of Ivy Fund Manager LLC, [Tan] will obey the Delaware charging order and pay $3 million to Mr. Xiao from the upcoming $52 million

---

[2] On March 1, 2023, Xiao obtained a judgment against Tan on his personal guaranty of the loans made to Ivy Fund in the amount of $2,379,221.44 in the Superior Court for the Commonwealth of Massachusetts.

Chicago real estate transaction, rather than keeping the money for himself. **No chance.**" *Id.* at ¶ 7 (emphasis in original).

### iii.    *The USIP Action*

62.    Another action by US Investment Properties, LLC ("**USIP**") further demonstrates Defendants' apparent pattern of escaping creditors while allegedly diverting money for Tan's benefit via Ivy Fund's convoluted corporate structure.

63.    On December 8, 2023, USIP filed a *Motion for Summary Judgment in Lieu of Complaint* against Ivy Fund and Tan in New York State, Monroe County, based on Ivy Fund's failure to repay a $6 million promissory note and Tan's breach of the personal guaranty (Index No. E2023014790).    That motion revealed that Ivy Fund had entered into a Forbearance and Modification Agreement with USIP, including a Confession of Judgment, acknowledging that Ivy Fund was indebted to USIP for over $7.18 million and providing a mechanism for USIP to take over one of the properties in Ivy Fund's portfolio (located in Chicago) in the event Ivy Fund failed to repay that amount within the noted forbearance period.    The motion also noted that Ivy Fund failed to repay USIP the amount it was owed during the forbearance period.

64.    On March 4 and 6, 2024, the court entered an order granting USIP's motion and entered judgment against Ivy Fund in the amount of approximately $8.5 million plus continuing interest at the per diem rate of $4201.56 and attorneys' fees.  Ex. I.

65.    Not surprisingly, the affidavit accompanying USIP's order to show cause for a turnover order repeats the claim—now the third one and second made under oath—that **"[Ivy Fund and Tan] are continuing to derive substantial revenue from the [p]roperties and are using their continued possession of the [p]roperties to divert money to themselves and the various shell companies they own, rather than paying [debt]**".  Ex. J at ¶ 7 (emphasis added). Further, Ivy Fund and Tan have caused NDG Student Living LLC, an entity owned by Tan that

manages properties in Ivy Fund's portfolio, "to pay out significant sums of money . . . as purported fees to NDG where, upon information and belief, it was then disbursed back to [Ivy Fund and Tan]." *Id*. at ¶¶ 10-11; *see also* Ex. K at ¶¶ 4-5 "[Ivy Fund and Tan] have allowed **$2.9 million to be taken out of the Chicago Property in income paid to NDG, [an entity owned by Tan,]** since August 2022." (emphasis added).

66.    USIP also questioned the legitimacy of Defendants' "creat[ion of] a vast network of companies and shell companies layered between them and the properties which they own]". *Id*. at ¶ 4.  In other words, USIP has also levied allegations indicating Defendants are engaged in a Ponzi-like scheme to enrich themselves (or just Tan) to the detriment of creditors like Plaintiff.

67.    On September 16, 2024, the court entered a stipulated order and judgment declaring USIP to own 100% of the membership interests in one of Ivy Fund's subsidiaries that holds title to the Chicago property, ordering Defendants to turn over all accounting information, financial statements, leasing information, tax information, and payroll information to USIP, and to remit to the court proceeds of the sale of the Chicago property.  Ex. L.

### II.    At Least One Property in Ivy Fund's Portfolio is Already in Receivership

#### iv.    The SPG Greensboro Equities LLC Action

68.    On November 28, 2022, SPG Greensboro Equities LLC ("SPG") filed a verified complaint against an Ivy Fund subsidiary in Delaware Chancery Court (Action No. 2022-1058-JTL) regarding one of Ivy Fund's properties in North Carolina.  SPG alleges that the Ivy Fund subsidiary violated the LLC agreement, in which SPG and the Ivy Fund subsidiary both had membership interest, because it stopped making membership distributions to SPG starting August 2022 and wrongfully excluded SPG entirely from all management decisions.  The Ivy Fund subsidiary also refused to furnish SPG with any financial statements in violation of the Delaware Limited Liability Company Act.

16

69.     Ivy Fund failed to appear in that case, resulting in the entry of a default judgment order on February 1, 2023 that, among other things, directed the Ivy Fund subsidiary to produce all financial statements and banking records.

70.     Further evidencing mismanagement at an alarming level, the Ivy Fund subsidiary (subject to the exclusive control and management of Tan) allegedly refused to comply with the judgment order and attempted to circumvent its obligations by selling the property without SPG's consent, prompting SPG to move for the appointment of a receiver over the company that holds title of the underlying property. Ex. M at ¶ 7.  In response, the Ivy Fund subsidiary entered into a Consent Order with SPG and stayed the contempt proceedings.  However, the Ivy Fund subsidiary allegedly continued to fail to comply with the Consent Order it voluntarily entered into and, seven months later, SPG requested to lift the stay and continue the motion to show cause.  Not surprisingly, the Ivy Fund subsidiary failed to meet the show cause order's requirements.  As a result, the Delaware Chancery Court, "**pursuant to its equitable powers**," appointed a receiver in that action.  *See* Ex. N at ¶ 3 (emphasis added).

71.     Defendants' conduct in the SPG action proves that Xiao's concern—which Plaintiffs share—that "no chance that, acting on behalf of Ivy Fund Manager LLC, [Tan] will obey [a court] order" is the reality and not an overstatement.

72.     Similarly, here, the appointment of a receiver to properly manage the affairs of Ivy Fund and to ensure the appropriate distribution of any profit or sale proceeds Ivy Fund obtains is urgent and necessary—and without it Plaintiffs and other creditors and stakeholders will not be able to recover the millions of dollars in debt they are owed by Ivy Fund and Tan.

### III.    *Additional Judgments Against Ivy Fund and Tan*

#### v.    *The Eastrich Action*

73.    On February 23, 2023, Eastrich Real Estate Fund IV LP ("Eastrich") filed a complaint against Ivy Fund and one of its subsidiaries for breach of contract in the Superior Court Department, Suffolk County Massachusetts (Civil Action No. 2384CV00473).  Eastrich claims that Ivy Fund failed to pay the amounts owed under two loan agreements and promissory notes that totaled $4,000,000 by their respective maturity dates in December 2021.  Upon such default, Tan executed a guaranty on April 19, 2022 but, again, failed to pay the principal and interest due under the guaranty.  Subsequently, Ivy Fund, Tan, and Eastrich executed an agreement to binding term sheet that outlined a payment schedule of the outstanding debt due, and an agreement for judgment in the amount of over $2.9 million.  Still, Ivy Fund failed to satisfy its debt obligations to Eastrich.  Further, neither Ivy Fund nor Tan appeared in the Eastrich Action.  On July 18, 2023, Eastrich obtained judgment against Ivy Fund in the amount of over $2.28 million, with interest accruing at 15% per annum from and after July 18, 2023 until the judgment is paid in full.

74.    Subsequently, Eastrich filed to register the Massachusetts judgment in the State of New York, Erie County on September 26, 2024 (Index No. 813977/2024).  On October 7, 2024, judgment was entered against Ivy Fund and one of Ivy Fund's subsidiaries that holds title to a property in Buffalo, New York.  Due to Ivy Fund's and Tan's inaction and the accrual of interest and fees, the judgment amount is **$2,688,173.55**.  Ex. O.

#### vi.    *The Zhao Action*

75.    On May 24, 2023 Gang Zhao filed a complaint against Ivy Fund and certain of its subsidiaries for breach of contract and breach of guaranty in the State of New York, New York County (Index No. 652487/2023).  Ivy Fund and its subsidiaries entered into a limited partnership purchase interest agreement with Zhao in April 2018, under which Zhao invested $500,000 in Ivy

Fund as working capital in exchange for Ivy Fund's promise of quarterly preferred payments until the terms ended in April 2020. When the terms ended, Ivy Fund was obligated to continue paying quarterly preferred payments unless it redeemed the principal investment. However, Ivy Fund was only able to make three full quarterly preferred payments and was either short or failed entirely on the other quarterly payments. Further, Ivy Fund did not redeem Zhao's principal investment but only made two less-than-full-amount payments after April 2020. Since October 2021, Ivy Fund has stopped making any payment altogether.

76.    Repeating an all-too-familiar pattern, Ivy Fund and Tan did not just ignore their payment obligations to Zhao; Ivy Fund also failed to appear in the Zhao action. As a result, on September 26, 2024, the court issued a default judgment against Ivy Fund and certain of its subsidiaries in the total amount of **$836,899.57**. Ex. P.

### vii.    *The Samson Action*

77.    On May 29, 2024, Samson MCA LLC ("Samson") filed a verified complaint against Ivy Fund, Tan, and certain Ivy Fund subsidiaries in the State of New York, Rockland County for breach of contract and guarantee agreement (Index No. 032960/2024). According to the complaint, from February to November 2022, Tan, Ivy Fund, and Ivy Fund's subsidiaries entered into four agreements to purchase all rights to future receivables with Samson whereby Ivy Fund agreed to remit a percentage of the receivables until the full amount was remitted, and Tan agreed to guarantee any and all amounts owed to Samson.

78.    Further manifesting Ivy Fund's pattern of escaping debt obligations under Tan's control and management for at least the past three years, Ivy Fund and its subsidiaries failed to meet their payment obligations to Samson and Tan breached his personal guaranty agreement.

79.     Again, neither Defendants nor any of Ivy Fund's subsidiaries appeared in this action.  As a result, on July 22, 2024, the court entered default judgment against Defendants and certain of Ivy Fund's subsidiaries in an amount totaling **$2,455,889.33**.  Ex. Q.

### viii.    *The 19 Plover Lane Action*

80.     In all the above actions where Defendants made an appearance, counsel for Defendants had an address of 19 Plover Lane, Lloyd Harbor, NY 11743 ("19 Plover Lane").  *See, e.g.*, Ex. L.

81.     A recent foreclosure action on the 19 Plover Lane property reveals that Tan, through yet another shell entity—19 Plover Lane Associates, LLC—holds title to 19 Plover Lane.

82.     In light of Tan's pattern of creating shell entities to hide ownership and his admission to shifting money between entities he owns, Plaintiffs have reason to believe that the purchase of 19 Plover Lane may have been financed by funding received through Plaintiffs without Plaintiffs' consent.

83.     Tan's default on 19 Plover Lane further dooms any chance of Plaintiffs recovering payment from Defendants, absent the appointment of a receiver.

84.     Any of the above actions would raise concerns about the management of Ivy Fund and the legitimacy of Ivy Fund's operations.  Combined, they paint a clear picture of the Ponzi-like scheme Defendants are running (a scheme that is intentionally fraudulent, at worst, or grossly negligent at best), retaining profit for Tan's own benefit through the creation of a "convoluted organizational structure" while debt remains unpaid and is actively avoided, while making multiple empty promises and misrepresentations as a delay tactic.  *See* Ex. J, at ¶15. This scheme has led to, and will only continue lead to, cross defaults on all of Ivy Fund's obligations to the detriment of all stakeholders.

85.     Defendants' misconduct has already led to the loss of control over the management of three properties within Ivy Fund's portfolio (specifically, the properties included in the SPG action, the CDH action and the USIP action).[3]  Any further loss of control over the development of properties within Ivy Fund's portfolio will significantly damage any remaining value of Ivy Fund and potentially leave Plaintiffs and other creditors with no recourse.

86.      Concern over this scheme is only exacerbated by the fact that Tan has relocated to Singapore, increasing the risk of transferring any remaining value of Ivy Fund overseas via payment to one or more of the shell entities he controls and making it more difficult for Plaintiffs and other stakeholders to collect on their debts.

87.     For each of these reasons, appointment of a Receiver is crucial, urgent, and necessary.

<u>**COUNT I**</u>
<u>**BREACH OF IMPLIED CONTRACT (LOAN AGREEMENTS)**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

88.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

89.     Ivy Fund provided Plaintiffs with a template secured note agreement and a template membership interest pledge and security agreement.

90.     Plaintiffs lent funds to Defendants pursuant to the understanding that Defendants would execute Note Agreements and pledge and security agreements that resembled the template versions Plaintiffs received.

91.     In so doing, Plaintiffs entered into implied contracts with Defendants by which Defendants agreed to repay the full amount Plaintiffs loaned to Defendants.  While Defendants

---

[3] The judgment in the Eastrich action will potentially lead to Ivy Fund's loss of control and management of its property in Buffalo, New York.

have repaid some amount to Plaintiffs, an outstanding balance of at least $17 million is still owed to Plaintiffs.

92.     The mutual understanding and intent of Plaintiffs, on the one hand, and Defendants, on the other, is demonstrated by each group's conduct and course of dealing.

93.     Defendants solicited, offered, and invited Plaintiffs to provide loans to Defendants to support Ivy Fund's business operations pursuant to the template note agreement and pledge and security agreement Plaintiffs received.

94.     In accepting loans from Plaintiffs, Defendants understood and agreed that they were required to repay Plaintiffs any and all amount loaned by Plaintiffs.  Defendants further understood that they were required to make interest payments before they were able to repay the full amounts loaned by Plaintiffs.

95.     In entering into such implied contracts, Plaintiffs reasonably believed and expected that Defendants would repay Plaintiffs any and all amounts of loaned funds and make interest payments before all amount had been repaid to Plaintiffs.  Defendants failed to do so.

96.     Plaintiffs would not have provided loans to Defendants in the absence of their implied promise.

97.     Plaintiffs have fully and adequately performed all obligations under the implied contracts with Defendants.

98.     Defendants breached the implied contracts they made with Plaintiffs by failing to repay interest and the full amount of the loaned funds to Plaintiffs.

99.     As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs have sustained damages in an amount to be determined at trial, but not less than all

outstanding principal, interest, costs and attorneys' fees owed under all implied agreements between Plaintiffs and Defendants.

**COUNT II**
**BREACH OF IMPLIED CONTRACT (DIRECT LOANS)**
**(AGAINST ALL DEFENDANTS)**

100.     Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

101.     Defendants solicited, offered, and invited Plaintiffs to provide loans to Defendants to support Ivy Fund's business operations via direct financing for the acquisition of real estate properties in Ivy Fund's portfolio and via direct loans to Defendants.

102.     Plaintiffs provided loans to Defendants, in a total amount of at least $17 million, pursuant to the understanding that Defendants would repay the amount loaned to Defendants and make interest payment before then.

103.     In accepting the loans from Plaintiffs, Defendants understood and agreed that they were required to repay any and all amounts loaned by Plaintiffs.  Defendants further understood that they were required to make interest payments to Plaintiffs before they were able to repay the full amount of loaned funds.

104.     In so doing, Plaintiffs entered into implied contracts with Defendants by which Defendants agreed to repay the full amount Plaintiffs loaned to Defendants and all interest payment due thereunder.

105.     The mutual understanding and intent of Plaintiffs, on the one hand, and Defendants, on the other, is demonstrated by each group's conduct and course of dealing.

106.     Indeed, in the beginning, Defendants repaid Plaintiffs certain amounts back. However, Defendants have stopped repaying Plaintiffs since early 2022 and an outstanding amount of at least $15 million is still owed to Plaintiffs.

107.    In entering into such implied contracts, Plaintiffs reasonably believed and expected that Defendants would repay Plaintiffs any and all amount of the loaned funds and make interest payments before all amounts had been repaid to Plaintiff.  Defendants failed to do so.

108.    Plaintiffs would not have provided loans to Defendants in the absence of their implied promise.

109.    Plaintiffs have fully and adequately performed all obligations under the implied contracts with Defendants.

110.    Defendants breached the implied contracts they made with Plaintiffs by failing to repay Plaintiffs the full amount of the loaned funds and all interest payments.

111.    As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs have sustained damages in an amount to be determined at trial, but not less than all outstanding principal, interest, costs and attorneys' fees owed under all implied agreements between Plaintiffs and Defendants.

**COUNT III**
**QUANTUM MERUIT/UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

112.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

113.    This Count is pleaded in the alternative to Counts I and II above.

114.    Plaintiffs conferred a monetary benefit on Defendants.  Specifically, Plaintiffs loaned money totaling over $35 million to Defendants.

115.    Defendants knew that Plaintiffs conferred a benefit upon them and have accepted and retained that benefit by accepting and retaining the money they received from Plaintiffs and

by retaining ownership or control over the properties that is financed, at least partially, by Plaintiffs.

116.    Defendants failed to pay Plaintiffs back the full amount of funds loaned to Defendants.

117.    Therefore, Defendants acquired the amount of money Plaintiffs loaned them through inequitable means as they failed to pay it back.

118.    If Plaintiffs knew that Defendants would not return the loaned amount of funds, Plaintiffs would not have loaned those funds to Defendants.

119.    Plaintiffs have no adequate remedy at law.

120.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs conferred upon them.

121.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will suffer injury, in an amount to be determined at trial, including but not limited to: (i) loss of benefit of the bargain; (ii) lost or diminished amount of funds transferred; (iii) lost opportunity costs associated with the amount of funds transferred; (iv) pre-judgment and post judgment interest and any other costs or fees, including attorney's fees.

### COUNT IV
### APPOINTMENT OF RECEIVER IN EQUITY UNDER F.R.C.P. 66
### (AGAINST DEFENDANT IVY FUND)

122.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs as though fully set forth herein.

123.    The equitable considerations set forth herein support the appointment of a receiver to manage and operate Ivy Fund's business.  In light of Ivy Fund's ongoing payment defaults to

Plaintiffs and multiple default judgments against Ivy Fund, it is clear that Ivy Fund does not have sufficient funds to repay the obligations in full to Plaintiffs.

124.    In light of allegations of fraud, theft, and mismanagement made in existing litigations, including admitted practices of shifting monies between accounts, alleged falsification of bank records, and a pattern of making empty promises that has led to a snowball effect of accruing debt, it is clear that there is currently no capable management running the day-to-day operations of Ivy Fund.

125.    Indeed, Tan appears to operate Ivy Fund and its multiple subsidiaries and shell entities in a Ponzi-like scheme to enrich himself while hiding assets from or making it nearly impossible to obtain repayment by creditors like Plaintiff.

126.    Existing litigation further revealed that even with court ordered judgments against Ivy Fund, absent the appointment of a receiver to take control of Ivy Fund's operations, Plaintiffs and other creditors alike have no chance to recover debt under Tan's control and management.

127.    Equally alarming is Tan's convenient relocation to Singapore, which creates a serious risk of fraudulently transferring any remaining asset of Ivy Fund to overseas for Tan's exclusive benefit.

128.    If Ivy Fund's business, including multiple properties within its portfolio, is not preserved, Plaintiffs and all other creditors of the Defendants will be left with no adequate legal remedy to redress the harm arising from Defendants' breaches of implied contracts and failure to properly manage Ivy Fund's business.  The potential harm to Plaintiffs, as well as the Defendants' other creditors, outweighs any conceivable harm to the Defendants.

129.    Time is of the essence.

130.    In the event Plaintiffs are not entitled to the appointment of a receiver as a legal remedy, Plaintiffs would have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

A.    That the Court immediately appoint a receiver to take possession of, control and hold the Defendants' assets;

B.    That the Court grant Plaintiffs the relief they seek on all counts;

C.    Prejudgment interest at the highest rates permitted by law and from the earliest date until paid in full;

D.    Post-judgment interest at the legal rate for all sums awarded herein;

E.    Such other relief as the Court deems just and proper.

Dated:  October 25, 2024
       New York, NY

BARNES & THORNBURG LLP

By: s/ Gregory Plotko
    Gregory Plotko

390 Madison Avenue, 12th Floor
New York, New York 10017
Telephone: (646) 746-2000
Facsimile: (646) 746-2001

-and-

Vincent P. (Trace) Schmeltz III
(*pro hac vice* forthcoming)
Ning He (admission forthcoming)
Aaron Gavant (*pro hac vic*e forthcoming)

BARNES & THORNBURG LLP
1 North Wacker Drive Suite 4400
Chicago, Illinois 60606
Telephone: (312) 357-1313
Facsimile: (312) 759-5646

*Counsel for Plaintiffs OC Ventures and Yanglong Song*

<u>Verification</u>

I, Yanglong Song, hereby declare under penalty of perjury of the law of the United States of America as follows:

I have reviewed the foregoing Verified Complaint and I verify that the statements of facts contained herein are true and correct to the best of my knowledge and information, except as to matters therein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

Dated this 25th day of October 2024

By: _Yanglong Song_ 宋杨龙
Yanglong Song